1

2    **E-Filed 10/30/2006**

3

4

5

6

7

8                        NOT FOR CITATION

       IN THE UNITED STATES DISTRICT COURT
9
     FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
                       SAN JOSE DIVISION
11

12
     UNITED STATES OF AMERICA and JAY          Case Number C 06-3734 JF (PVT)
13   GOLDENBERG, Estate Tax Attorney,
                                                ORDER[1] GRANTING IN PART AND
14                   Petitioners,               DENYING IN PART PETITION TO
                                                ENFORCE INTERNAL REVENUE
15          v.                                  SERVICE SUMMONS

16   DALE C. LANDON,                            [re: docket no. 1]

17                   Respondent.

18

19          Petitioners seek enforcement of an Internal Revenue Service ("IRS") summons served on

20   Respondent on February 2, 2006.  Respondent opposes the petition on the basis that he has

21   provided all information and materials not covered by the attorney-client privilege.  For the

22   reasons discussed below, the Court will grant in part and deny in part the petition.

23                              I. BACKGROUND

24          Petitioners make the following allegations in their reply to Respondent's response to the

25

26

27
       [1] This disposition is not designated for publication and may not be cited.
28

petition:[2] Respondent is a co-trustee of the Landon Family Trust ("Trust") and executor of his decedent father's ("Decedent") estate.  Respondent and his wife transferred the bulk of his parents' assets from the Trust to a family limited partnership ("FLP") with the assistance of attorney D. John Thornton ("Thornton").  Ownership of the FLP was then gifted in highly discounted chunks to Respondent and his brother, Jerry Landon.  In this manner, Decedent's assets were transferred to his children without being subject to federal estate or gift taxation.  IRS Estate Tax Attorney Jay Goldenberg ("Goldenberg") was assigned to examine decedent's estate tax return and the 2001 and 2002 gift tax returns.[3]

Petitioners first served a summons on Respondent on December 22, 2005.  *See* Reply Ex. A.  This summons required Respondent to appear before Kyle Martin, an IRS officer, to answer questions regarding the FLP.  The summons also required Respondent to bring associated documents including correspondence, computations, and forecasts to the appearance.  Respondent met with Goldenberg pursuant to this summons on February 2, 2006.  Respondent allowed himself to be interviewed on that date, but asserted the attorney-client privilege with respect to many questions and requests for documents.  *See* Testimony of D. John Thornton, Esq., Reply Ex. B; Dale Landon Interview, Reply Ex. B.  Respondent provided no documents on this date.

Petitioners served a revised summons on Respondent on February 2, 2006, requiring Respondent to appear before Goldenberg on February 17, 2006.  *See* Reply Ex. C.  The revised

---

[2]  Respondent has not responded to these allegations.  The Court expresses no opinion on the merits of Petitioner's allegations.

[3]  Petitioners inform the Court that the statutory provision at issue in their examination of the relevant tax returns is 26 U.S.C. §2036(a), which provides that an estate shall include property transferred by the decedent if he retains a life estate interest in the property.  This statutory section excepts any property transferred in "a bona fide sale for an adequate and full consideration in money or money's worth."  26 U.S.C. §2036(a).  The motivation for the summons at issue in the present petition was to determine whether the estate qualifies for this "bona fide sale" exception.

The applicability of this statutory provision and the issue is not before the Court at this time.

1  summons repeated the requirements of the first summons with the exception that it expanded the

2  scope of its request regarding the family's reasons for forming the FLP.  Respondent did not

3  appear on February 17, 2006.  On February 23, 2006, IRS Associate Area Counsel Miles D.

4  Friedman wrote to Thornton notifying Respondent that local proceedings might be brought if

5  Respondent did not meet with Goldenberg on March 3, 2006.  Respondent did not meet with

6  Goldenberg on this date.

7        On June 12, 2006, Petitioner filed a petition to enforce the summons.  On June 16, 2006,

8  the Court issued an order that Respondent show cause why he should not be compelled to appear

9  and provide documents and testimony.  The Court heard oral argument on October 13, 2006.

10 The parties thereafter filed supplemental letter briefs regarding the compulsion of additional

11 questions not included in the original motion to compel.

12                                  **II. LEGAL STANDARD**

13        IRS summonses are "subject to the traditional privileges and limitations, including the

14 attorney-client privilege."  *Segerstrom v.United States*, 2001 WL 283805 (N.D. Cal.) (quoting

15 *Upjohn Co. v. United States*, 449 U.S. 383, 398 (1991)).  The essential elements of the attorney-

16 client privilege are as follows: (1) Where legal advice of any kind is sought, (2) from a

17 professional legal adviser in his capacity as such, (3) the communications relating to that

18 purpose, (4) made in confidence, (5) by the client, (6) are at his instance permanently protected,

19 (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.  *In re.*

20 *Fischel*, 557 F.2d 209, 211 (9th Cir. 1977) (citing 8 Wigmore Evidence, § 2292 at 554

21 (McNaughton rev. 1961)).  "The purpose of the privilege is to make clients make full disclosure

22 to their attorneys."  *Fisher v. United States*, 425 U.S. 391, 403 (1976) (citing 8 Wigmore §§

23 2291, 2306); *see also Gomez v. Vernon*, 255 F.3d 1118, 1131 (9th Cir. 2001) ("Federal common

24 law recognizes a privilege for communications between client and attorney for the purpose of

25 obtaining legal advice, provided such communications were intended to be confidential.").  To

26 avoid the implied disclosure of confidential client communications, "the privilege normally

27 extends both to the substance of the client's communication as well as the attorney's advice in

28

Case No. C 06-3734 JF (PVT)
ORDER GRANTING IN PART AND DENYING IN PART PETITION TO ENFORCE INTERNAL REVENUE
SERVICE SUMMONS
(JFLC1)

1   response thereto." *In re. Fishel*, 557 F.2d at 211  The privilege does not extend beyond the

2   client's confidential communications with his or her attorney, and "[a]n attorney's involvement

3   in, or recommendation of, a transaction does not place a cloak of secrecy around all the incidents

4   of such a transaction." *Id.* at 212.  "[T]he cloak of the privilege simply protects the

5   communication from discovery, the underlying information contained in the communication is

6   not shielded from discovery." 979 F.2d 939, 944 (2d Cir. 1992).

7       "The attorney-client privilege . . . does not cover the fact (or not) of whether one sought

8   legal advice." *Methode Electronics, Inc. v. Rinisar Corp.*, 205 F.R.D. 552, 556 (N.D. Ca. 2001)

9   (citing *Gomez*, 255 F.3d at 1131).  The attorney-client privilege does not protect communications

10  such as fee arrangements that do not convey the substance of confidential professional

11  communications. *Ousterhoudt v. United States*, 722 F.2d 591, 593-94 (9th Cir. 1983).  The

12  amount of a fee is generally not protected by the attorney-client privilege. *Clarke v. America*

13  *Commerce Bank*, 974 F.2d 127, 129 (9th Cir. 1992).  However, "correspondence, bills, ledgers,

14  statements, and time records which also reveal the motive of the client in seeking representation,

15  litigation strategy, or the specific nature of the services provided, such as researching particular

16  areas of law, fall within the [attorney-client] privilege." *Id.*

17                              **III. DISCUSSION**

18      The parties dispute whether Respondent may decline to answer a series of questions and

19  requests for documents on the basis of the attorney-client privilege.[4]  The Petitioners do not argue

20  that the Respondent has waived his attorney-client privilege[5] or that they should have access to

---

22      [4]  Petitioners refer to Respondent's claim of the attorney-client privilege as to the items
23  regarding the creation of the FLP (Entry Nos. 48, 54, 55, and 58), as well as to the billing
    statements (Entry No. 51).  Reply 4.  Petitioners argue that Respondent bears the burden of
24  providing that materials are privileged, but does not argue that Respondent may not assert the
25  privilege with respect to any parts of entries 48, 51, 54, 55, and 58.  Petitioners instead argue that
    the Court should compel Respondent to answer and produce a subset of those questions and
26  documents requested in entries 48, 51, 54, 55, and 58.

27      [5]  Respondent argues that the privilege has not been waived, Response 3-4, but the Court
28  does not perceive an argument to the contrary in the petition or the reply.  Instead, the Petitioners
    only suggest on two occasions that Respondent could waive this right.  Reply 5, 7.  The Court

4

1    privileged materials.

2    1.      Letter From Thornton to Respondent

3            Respondent asserts that the attorney-client privilege protects a letter faxed by Thornton to

4    Respondent on February 23, 2000.  Response Ex. 2.  Respondent asserts that this is the only

5    correspondence in Thornton's files concerning the formation of the FLP.  The Koslowski

6    Declaration asserts that this letter contains legal advice and that the contents have not been

7    disclosed to anyone other than Respondent or his attorneys.  Petitioners concede that "the letter is

8    probably privileged based on the description based on the description provided in the Kozlowski

9    Declaration."  Reply 5.  Petitioners write that they "do not request enforcement where the

10   description of the document on its face bears a viable claim of privilege."  *Id.*  The Court will

11   therefore deny the petition to the extent that it seeks to compel production of the letter faxed on

12   February 23, 2000.

13   2.      Oral Testimony - Formation of the FLP

14           a.      Questions Objected to on the Basis of the Attorney-Client Privilege

15           Petitioners seek to compel Respondent to answer a series of questions which he has

16   declined to answer on the grounds of the attorney-client privilege.  *See* Dale Landon Interview,

17   Petition Ex. B (questions 16-17, 24-31, 34-45, 48-49, 51-53, 55, 93).  Goldenberg posed these

18   questions to Respondent on February 2, 2006.

19   Question 17:

20           Question 17 asks: "How did the idea of forming the LP come about?"  This question

21   might implicate the confidential communication of Respondent's motivations and reasons for

22   formation of the FLP to Thornton.  For example, Respondent might answer question 17: "The

23   idea of forming the LP came from confidential-consultation with my attorney."  The attorney-

24   _____

25   therefore will not address this issue.

26           Petitioners also do not argue that Respondent's failure to produce a privilege log
     constitutes waiver of the attorney-client privilege.  Instead, the Petitioners state that they have
27   treated the Declaration of Joseph Kowlowski as "functionally equivalent to privilege logs."  The
     Court therefore will not consider whether Respondent has waived the attorney-client privilege by
28   his failure to produce a privilege log.

                                                5

1   client privilege would cover such a response because such information would identify the

2   specific nature of the services Thornton provided to Respondent.  *See Clarke* 974 F.2d at 129.

3   However, the attorney-client privilege would not allow Respondent to decline to answer

4   this question if the idea of forming the FLP arose prior to, or independent of consultation with an

5   attorney.  Petitioners should refine this question if they want to gather such information.

6   Question 29:

7   Question 29 asks: "Who has personal knowledge of your reasons and motivations for the

8   formation and use of the LP?"  Like question 17, question 29 might implicate the confidential

9   communication of Respondent's motivations and reasons for formation of the FLP to Thornton.

10  For example, Respondent might answer question 29: "My attorney has personal knowledge of

11  my reasons and motivations for the formation of the LP."  The attorney-client privilege allows

12  Respondent to decline to give such a response because it would identify the specific nature of

13  Thornton's representation of Respondent.  *See Clarke*, 974 F.2d at 129.

14  However, the attorney-client privilege would not allow Respondent to decline to answer

15  question 29 to the extent that it asks whether persons other than his attorney had personal

16  knowledge of his reasons and motivations for the formation of the FLP.  Petitioners should refine

17  this question if they want to gather such information.

18  Question 31:

19  _____Question 31 asks: "How many meetings were there with Mr. Thornton or any one from

20  his office to form the LP?"  This question would confirm the specific nature of Thornton's

21  representation of Respondent.  The attorney-client privilege allows Respondent to decline to

22  answer this question.  *See Clarke*, 974 F.2d at 129.

23  Questions 30, 41-43:

24      30.   Do you know of any document that corroborates your reasons for the formation of
            the LP?

25      . . .

26      41.   Did Mr. Thornton or anyone from his offices send you any letters, emails or other
            correspondence about the formation of the LP?

27      42.   Did you send Mr. Thornton or anyone from his office any letters, emails or other
            correspondence about the formation of the LP?

28      43.   Do you have the letters, emails or other correspondence Mr. Thornton or anyone

6

1   from his office sent you or you sent Mr. Thornton or anyone from his office about
2   the formation of the LP?

3       Questions 41-43 pertain to correspondence between Respondent and Thornton on the

4   subject of the FLP.  These questions appear intended to confirm the specific subject matter of

5   Thornton's representation of Respondent.  The attorney-client privilege shields the disclosure of

6   the specific nature of the services provided.  *See Clarke*, 974 F.2d at 129.  Respondent therefore

7   may decline to answer these questions on the basis of the attorney-client privilege.

8       Question 30 appears to cover the same ground as questions 41-43, and Respondent may

9   also decline to answer it on the grounds of attorney-client privilege.  This question also would

10  include in its scope any documents outside the representation of Respondent, such as a letter by

11  Respondent to a family member.  Petitioners should refine this question if they seek to learn

12  about documents created outside Respondent's confidential attorney-client relationship with

13  Thornton.

14  Question 45:

15      Question 45 asks: "Did you see any calculations or projections of the tax benefits to be

16  achieved by forming the LP?"  This question appears to pertain to correspondence between

17  Respondent and Thornton, but does not specifically ask if Respondent received such forecasts

18  from Thornton.  This lack of specific reference to Thornton makes this question similar to

19  questions 17 and 29, in that it implicates confidential communications under some

20  circumstances, but not others.  Respondent may assert the attorney-client privilege with respect

21  to question 45 to the extent that it implicates forecasts received from counsel, for the same reason

22  that he may with respect to questions 17 and 29.

23      However, the attorney-client privilege does not allow Petitioner to decline to answer

24  questions regarding calculations or projections that were created outside his confidential

25  attorney-client relationship with Thornton.  Petitioners should refine this question if they want to

26  know if Respondent received forecasts from other sources than Thornton or prior to the

27  formation of an attorney-client relationship.

28  Question 55:

7

Case No. C 06-3734 JF (PVT)
ORDER GRANTING IN PART AND DENYING IN PART PETITION TO ENFORCE INTERNAL REVENUE
SERVICE SUMMONS
(JFLC1)

1    _____Respondent stated in his interview that the following statement was not correct: "The

2    'Consent to Actions by Partners of Landon Associates L.P.  In Lieu of Organization Meeting'

3    dated January 1, 2000 states that the LP will be funded by the Family Trust's contribution of <u>all</u>

4    of its assets as of January 1, 2005."  Question 55 asks: "What should it say if it is not correct?"

5    The recorded answer is: "Mr. Thornton directs him not to respond and the reason doesn't

6    matter."  Respondent's letter brief includes this question in the list of questions to which he

7    objects on the basis of the attorney-client privilege.  The statement which formed the basis for

8    question 55 includes no reference to attorney-client communications.  Therefore, Respondent

9    may not refuse to answer question 55 on the basis of the attorney-client privilege.

10   <u>Remaining Questions (16, 24-28, 34-40, 44, 48-49, 51-53, 93)</u>

11        16.     How did you meet Mr. Thornton?

12        . . .

13        24.     Who made the decision to form the LP?
          25.     Why did you want to form and use the LP?
          26.     Were your parents aware of the LP?

14        27.     Did they want to form and use it?
          28.     To what extent was Carol Landon involved in the decision to form and use the

15              LP?

16        . . .

17        34.     Were the meetings [with Mr. Thornton] in person?
          35.     Who was present at each meeting you attended to form the LP?
          36.     Who was present at each meeting to form the LP that you did not attend?

18        37.     Did you take any notes at any of the meetings attended to form the LP?
          38.     Did you ask any questions at any of the meetings you attended to form the LP?

19        39.     Do you know if your parents attended any meetings with Mr. Thornton?
          40.     Did decedent ask any questions at the meetings you attended to form the LP?

20        . . .

21        44.     Did Mr. Thornton or anyone from his office send decedent any letters, emails or
                other correspondence about the formation of the LP?

22        . . .

23        48.     Were any of the terms of the LP agreement negotiated among the
                partners/members?

24        49.     By negotiations, I am referring to the following:
                a.  Decision as to whom would be a partner/member.

25              b.  Decision as to whom would be a general partner/managing member.
                c.  Decision as to whom would be a limited partner.

26              d.  Responsibilities of a general partner/managing member.
                e.  The extent of each partner's/member's ownership interest in the LP.

27              f.  When distributions could be made.
                g.  Circumstances under which partnership/LLC interests could be sold.

28              h.  Circumstances under which partners/members could withdraw.

8

1              i.  What assets should be used to fund the LP.
                j.  How income from the LP will be divided.

2    . . .

3    51.      Did you read the agreement before signing it?
    52.      Did you follow all of the terms of the LP agreement?

4    53.      Who decided which assets were to be contributed to the LP?
    . . .

5

6    93.      Were you parents financially dependent on LP distribution?

7          These remaining questions do not implicate correspondence or other communications

8   between Respondent and Thornton.  The attorney-client privilege is inapplicable because that

9   privilege applies to "communications between client and attorney for the purpose of obtaining

10  legal advice."  *Gomez*, 255 F.3d at 1131.  Respondent therefore may not decline to answer the

11  remaining questions on that basis.

12          b.      Questions Objected to on the Basis of Having Previously Answered

13         Petitioners seek to compel Respondent to answer two questions which he declined to

14  answer at the February 2nd interview on the basis that he had already provided answers.  The

15  attorney-client privilege attaches to neither question.

16  <u>Question 84:</u>

17         Question 84 asks: "Did you follow section 4.1 of the LP agreement in determining how

18  much to distribute in 2001 and who to distribute it to?"  The recorded answer is: "Mr. Thornton

19  instructs him not to answer on the basis he already explained it."  Question 82 had asked the

20  identical question about the 2000 distributions.  The recorded answer is: "He did not go back and

21  read the LP agreement."  This may be the previous explanation referred to in Thornton's

22  instruction that Respondent not answer question 84.  However, there is no indication that the

23  answer to question 84 is the same as the answer to question 82.  Respondent had not already

24  explained the 2001 distributions in any meaningful manner.  Respondent therefore may not

25  decline to answer question 84 on this basis.

26  <u>Question 86:</u>

27         Question 86 asks: "Did you follow section 4.1 of the LP agreement in determining how

28  much to distribute in 2002 and who to distribute it to?"  The recorded answer is: "Mr. Thornton

instructs him not to answer on the basis he already explained it."  Respondent may not decline to
answer question 86 on this basis for the same reason that he may not decline to answer question
84 on this basis.

3.      Billing Statements and Invoices

Petitioners seek to compel Respondent to produce billing statements and invoices relating
to the creation of the FLP.  The attorney-client privilege does not protect communications such as
fee arrangements that do not convey the substance of confidential professional communications.
*Ousterhoudt*, 722 F.2d at 593-94.  The amount of a fee is generally not protected by the attorney-
client privilege.  *Clarke*, 974 F.2d at 129.  However, "correspondence, bills, ledgers, statements,
and time records which also reveal the motive of the client in seeking representation, litigation
strategy, or the specific nature of the services provided, such as researching particular areas of
law, fall within the [attorney-client] privilege."  *Id.*  Respondent therefore must provide
Petitioners with the requested billing records and invoices, but may redact any privileged
information which speaks to the specific nature or substance of the services provided or reveals
client motives or litigation strategy.

## IV. ORDER

Good cause therefore appearing, IT IS HEREBY ORDERED THAT:

1.      The Petition is DENIED with respect to the letter faxed by Thornton to
        Respondent on February 23, 2000, and questions 17, 29-31, 41-43, and 45 of the
        oral testimony.

2.      The Petition is GRANTED with respect to questions 16, 24-28, 34-40, 44, 48-49,
        51-53, 55, 84, 86, and 93 of the oral testimony and the non-privileged portions of
        billing statements.

3.      Petitioners' request for an award of costs is DENIED.

1 | DATED: October 30, 2006

2

3

4

_____

5 | JEREMY FOGEL
United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 06-3734 JF (PVT)
ORDER GRANTING IN PART AND DENYING IN PART PETITION TO ENFORCE INTERNAL REVENUE
SERVICE SUMMONS
(JFLC1)

1   This Order has been served upon the following persons:

2   Cynthia Lewis Stier                    cynthia.stier@usdoj.gov

3   Tim A. Tarter                          tim@woolston-tarter.com, nancy@woolston-tarter.com

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

12